## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

STRATUS REDTAIL RANCH, LLC, a Colorado limited liability company,

      Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation; and WWD LIMITED LIABILITY COMPANY, a Colorado limited liability company, a/k/a WWD, LLC,

      Defendants.

---

## COMPLAINT

---

Plaintiff, STRATUS REDTAIL RANCH, LLC (hereinafter "Plaintiff" or "Stratus"), for its Complaint against the Defendants alleges:

### I.    NATURE OF THE ACTION

1.    Stratus brings this action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA") with respect to releases and/or threatened releases (as "release" is defined in CERCLA Section 101(22)) of hazardous substances (as defined in CERCLA Section 101(14)) at a site currently referred to, on the website of the Colorado Department of Health & Environment ("CDPHE"), as the "Neuhauser Landfill." The Neuhauser Landfill is a "facility" within the meaning of Section 101(9) of CERCLA. The Neuhauser Landfill site is situated within a larger, 290 acre parcel (the "Redtail Property") purchased by Stratus from WWD, LLC ("WWD"), which parcel is approximately 2 miles southeast of the Town of Erie, Colorado.

2.      The hazardous substances at the Neuhauser Landfill have contaminated soil and shallow ground water under the facility (investigation of deep ground water contamination is pending), and have threatened public health and safety.  Upon information and belief, International Business Machines Corporation ("IBM") and WWD are the major and primary "potentially responsible parties" ("PRP"), as defined under CERCLA Section 107(a) for such contamination.  Each of the above-named Defendants previously owned the Neuhauser Landfill, operated a facility, or was  an arranger, with respect to hazardous substances at the Neuhauser Landfill and as contemplated under 42 U.S.C. §9607(a).

3.      Stratus purchased the Redtail Property on July 15, 2015 without knowledge of the existence of hazardous substances on the Property, and after conducting "all appropriate inquiry" ("AAI", codified at 40 C.F.R. Part 312, as amended), as contemplated under CERCLA, making Stratus an "innocent landowner" ("ILO as defined in CERCLA Sections 101(35) and 107(b)(3)) and/or as a "bona fide prospective purchaser" ("BFPP" as defined in CERCLA Sections 101(40) and 107(r)).  Upon Stratus' discovery of such contamination, Stratus cooperated with both the federal Environmental Protection Agency ("EPA") pursuant to the November 27, 2017 Administrative Settlement Agreement and Order on Consent for Removal Action ("AOC"), and the May 15, 2018  Compliance Order on Consent with the CDPHE ("COC") (sometimes collectively "Consent Orders").

4.      To date, Stratus has actually incurred in excess of $4,000,000.00 in such environmental response, remediation and cleanup costs.  Stratus currently estimates that it will incur additional remediation and post-closure and monitoring and maintenance costs, all as mandated by the COC, that approximate an additional $3,500,000.00 (for a total estimated environmental cleanup cost in excess of $7,000,000.00).  Stratus' final response and remedial

efforts are estimated to continue until 2021, and long-term monitoring and maintenance requirements may extend for up to an additional 30 years.

5.      All of Stratus' actual and anticipated investigative costs, remedial costs and costs of long-term monitoring and maintenance, constitute "response" costs (as defined in CERCLA Section 101(25)) and include "removal" actions, "remedial" actions, and enforcement activities related thereto.  See, 42 U.S.C. § 9601(25).   Such response costs have been, or will be, incurred pursuant to the Consent Orders, are reasonable and necessary, and are consistent with CERCLA's National Consistency Plan ("NCP").

6.      Stratus is a "person" (as defined in CERCLA Section 101(21)) entitled to seek redress under CERCLA's cleanup and recovery procedures, including recovery against IBM and WWD as PRPs.   CERCLA's recovery procedures specifically contemplate and protect private parties, such as Stratus, who promptly and responsibly take the initiative to remediate historical, environmental contamination caused by others.  CERCLA is designed to allow Stratus, as a first-responder and first-payor, to respond to and remediate the public health threats and environmental damage, for which the Defendant PRPs' are strictly liable, and then later recover its costs and/or seek contribution from the Defendant PRPs.

7.      Stratus seeks cost recovery and contribution from each Defendant pursuant to Sections 107(a) and 113(f) of CERCLA, 42 U.S.C. § 9607(a) and 9613(f), including with respect to such Defendants' release and "disposal" (as defined in CERCLA Section 101(29)) of hazardous substances, and for past and future response, remediation and long-term monitoring and maintenance costs incurred, and to be incurred, by Stratus related to the Neuhauser Landfill, along with a declaration as to each Defendant's liability and an allocation of past and future response and remediation costs.

## II.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action and over the

Defendants pursuant to Sections 107(a) and 113(b) and (f) of CERCLA,  42 U.S.C. § 9607(a)

and 9613(b) and (f), providing for federal jurisdiction over controversies arising under CERCLA,

and pursuant to 28 U.S.C. § 1331, providing for federal jurisdiction over controversies involving

questions of federal law.  The Court also has jurisdiction over Stratus' request for declaratory

relief under Section 113 of CERCLA,  42 U.S.C. § 9613 and to 28 U.S.C. §§ 2201 and 2202.

2.      Venue is proper in this district pursuant to Sections 107(a) and 113(b) of

CERCLA, , 42 U.S.C. § 9607(a) and 9613(b), and 28 U.S.C. § 1391(b), because the release or

threatened release of hazardous substances that give rise to this action occurred within the federal

District of Colorado and the Neuhauser Landfill is situated within this judicial district.

## III.    THE PARTIES – PLAINTIFF STRATUS

1.      Stratus is a Colorado limited liability company transacting business in the State of

Colorado at all relevant times, and with its principal offices located at 1842 Montane Dr.,

Golden, CO 80401.

2.      Beginning in 2014, Stratus considered purchasing the Redtail Property from

Defendant WWD for potential development.  Stratus contemplated that the southern and western

portions of the Redtail Property would be used for the construction of a significant number of

residential homes.  The entire Redtail Property had already been zoned for development of single

use residences.  Stratus further considered using the northeastern portions of the Redtail Property

(where the Nuehauser Landfill was ultimately discovered) as an open space and buffer for the

homes located on the southern portions. As part of Stratus' efforts to determine the suitability of

the Redtail Property for development, Stratus retained an established and qualified professional

environmental service company to conduct a Phase 1 Environmental Site Assessment pursuant to ASTM standards ("Phase 1").

3.      In March 2015, Stratus received and reasonably relied upon a Phase 1 that indicated: a) no "recognized environmental conditions" existed on the Redtail Property; b) no presence of hazardous waste or environmental contamination; and c) that all required procedures and measures under ASTM standards had been adhered to in issuing the Phase 1.  Stratus also heavily relied upon WWD's repeated representations to Stratus, both before and long after the July 2015 purchase of the Redtail Property, that the Property had only been used for "dry-wheat farming" as far back as the early 1900's and that the Property was suitable for Stratus' planned residential development.

## DEFENDANT IBM CORPORATION

4.      Defendant IBM is a New York corporation with its headquarters in Armonk, New York, and offices, manufacturing plants and other locations throughout the world.  IBM remains one of the world's leading, high technology companies.  IBM currently has business operations located at 6300 Diagonal Hwy., Boulder, Colorado.  At all times relevant to this CERCLA action, including during the 1960's, IBM's Boulder location functioned as a manufacturing plant for high technology products including but not limited to the manufacture of computer equipment, reproduction and photocopying equipment, magnetic tape, and other products related to the computer, office machines and office supplies markets.

5.      During the 1960's, IBM's high technology manufacturing methods utilized large quantities of solvents containing toxic, volatile organic compounds ("VOCs") to prepare, clean and process its manufactured goods and materials.    Based upon, among other things, IBM's own historic records, IBM utilized certain key VOCs throughout this time period and particularly

5

used and disposed of large quantities of hazardous substances as defined under CERCLA including Cyclohexanone, 2-butanone (MEK), 4-methyl-2-pentanone (MIBK), Toluene, and other hazardous substances. IBM regularly and typically disposed of these hazardous substances in 55-gallon steel drums that may or may not have displayed IBM designations, and also displayed labeling of the chemical supply companies from whom IBM purchased such hazardous substances. IBM also generated and disposed of large quantities of solid wastes such as unused or scrap magnetic tape materials, paper and other typical office and manufacturing waste from the sizable staff and office operations located at its Boulder plant.

6.    The EPA conducted a 1984 Preliminary Assessment and a Site Inspection of what was referred to as the "Columbine Landfill" ("1984 Assessment") in an area that is approximately adjacent to what became known as the Redtail Property. In 1990, the Colorado Department of Health (n/k/a the CDPHE) conducted an updated and Revised Preliminary Assessment of the "Columbine Landfill" ("1990 Assessment"). In such Assessments, the Columbine Landfill was identified as part of larger real property holdings of the Pratt family (generations of Pratt family owned and farmed significant acreage, and later sold and/or developed much of the same, including portions of what became the City of Longmont and the Town of Erie, Colorado).

7.    In both the 1984 and 1990 Assessments, and based in part upon the EPA's records, the CDPHE confirmed and reported that *"approximately 1500 drums containing 84,000 gallons of liquid were disposed on the Pratt property. The waste was generated by IBM between 1965 and 1969. The nature of the liquid wastes were suspected as solvents, unspecified organics, inorganics, acids and bases."* See, 1990 Assessment at section 2.2. Appendices to the 1990 Assessment contain further conclusive evidence of IBM's generation and disposal of such

hazardous substances, including IBM's completion and submission of the EPA form *Notification of Hazardous Waste Site,* and the EPA form *Generator Hazardous Waste,* wherein IBM documented and admitted its generation and disposal of the aforementioned, liquid hazardous substances.

8.      During the 1960's and for the disposal of these hazardous substances, IBM primarily contracted with and arranged for disposal by Sanitation Engineering, Inc., a Colorado corporation (believed to have been dissolved and defunct years ago), that was owned and operated by John Neuhauser.   At relevant times, Mr. Neuhauser's company was the primary contractor used by IBM to collect weekly IBM's liquid hazardous wastes (in the form of multiple 55-gallon steel drums), along with IBM's other solid wastes, and to haul such wastes for dumping and/or incineration in the location referred to as the "Pratt property" and/or the "Columbine Landfill" in the 1990 Assessment.  IBM was a generator and arranger, as defined under CERCLA, with respect to such activities and such hazardous substances.

9.      While the 1990 Assessment's title page stated that it pertained to the "Columbine Landfill", a close review of the many pages comprising the Assessment report and its Appendices , show that the dumping of IBM's toxic waste included Mr. Neuhauser's dumping of IBM's 55-gallon steel barrels in an "unnamed" site on the larger areas of the "Pratt property" and "in a drainage to the south of the [Columbine Landfill], liquid and solid disposal has occurred", and specifically involving "drummed chemical waste from IBM" including hazardous substances.

10.      The 1990 Assessment referred to this unnamed site as the "south draw" (the "South Draw") and specified that the South Draw was just to the south of the Columbine Landfill, and also to the south of another adjacent dump site named the "Old Erie Landfill" (the

South Draw, the Columbine and Old Erie Landfills were in 1990, or had previously been, owned

by the Pratt family). The 1990 Assessment also identified Sundstrand Aviation as an additional

company that dumped "torpedo propellant" in the South Draw which was "brought to the site in

tanker trucks and burned in on-site pits." See, e.g. 1990 Assessment at section 4.5 and

Appendices F and G.[1]

11.     Approximately in the Fall of 2016 and upon further investigations, including

involving the CDPHE and EPA, Stratus discovered that the toxic dumping of IBM waste into the

South Draw occurred within the Redtail Property. The site of such dumping is now designated as

the Neuhauser Landfill and is the subject of this CERCLA action.  Such discovery by Stratus

occurred over a year after Stratus acquired the Redtail Property from WWD.

12.     As a result of all of the foregoing, IBM is a PRP and is liable under CERCLA for

its actions including, without limitation, its actions as a generator, arranger, and for its release

and disposal of such hazardous substances at the Neuhauser Landfill.

### DEFENDANT WWD, LLC

13.     WWD was originally formed by members of the Pratt family in order to take title

to and hold the Redtail Property as a single purpose LLC.  Upon information and belief, Ken

Pratt was the original and founding member and manager of WWD in 1992. For example, and

without limitation, WWD acquired title in the Redtail Property by two Quit Claim Deeds

executed on November 16, 1992, the first from Karen K. Kramer, f/k/a Karen K. Landers, as

grantor, conveying her ½ undivided interest in the Redtail Property, and the second from

Kenneth E. Pratt, as grantor, conveying his ½ undivided interest in the Redtail Property. Karen

Kramer and Kenneth Pratt are siblings, and they each acquired their respective 1/2 undivided

---

[1] Upon information and belief, Stratus states that such torpedo propellant degraded to non-toxic remnants including ash from the prior incinerations such that Sundstrand Aviation does not represent a credible PRP for the environmental contamination that is the subject of this action.   See e.g., 1990 Assessment at Appendices F and G.

interests in the Redtail Property in a series of recorded conveyances from their mother, Anna M. Pratt, who had acquired the Redtail Property from her deceased husband Harold Pratt. Upon information and belief and upon the death of Ken Pratt, his interest in WWD passed to his wife Susan Pratt, and or passed in trust for his wife and/or his children. At all relevant times and at the time of Stratus' purchase of the Redtail Property, Karen Kramer and Susan Pratt were the two members of WWD and Susan Pratt was WWD's manager.

14.     Upon information and belief, the Pratt family had owned the land constituting the Redtail Property, and larger surrounding lands (including areas encompassing what would become the Columbine and Old Erie Landfills), since approximately 1912. The Pratts, and including the father Harold Pratt, had conducted farming on such lands. However and concealed from Stratus, the Pratt family had knowingly allowed the South Draw on the Redtail Property to be used as a toxic dump site now known as the Neuhauser Landfill.

15.     Upon information and belief, Harold Pratt (now deceased), desired to fill the deep South Draw (and other non-arable portions of the Pratt property) with landfill materials, which included solid and hazardous materials, so that the land could be leveled and thereafter farmed. Among other things, the Pratt family had specifically allowed and contracted for landfilling in the South Draw by leasing the site to Mr. John Neuhauser's company, Sanitation Engineering, Inc., in the mid-1960's for the specific purpose of its solid waste dumping into the South Draw. The Pratt family leased the land to Mr. Neuhauser's company for landfilling in exchange for 5% of any and all of the profits from its landfilling operations.

16.     Multiple instances exist wherein both the past and present members of Pratt family (including the founding and present members, managers and/or authorized agents of WWD) received notice and had actual knowledge of the serious and toxic landfilling that had

9

occurred in the Property's South Draw.   The toxic landfilling in the South Draw, occurring approximately 1965 to 1969, was conspicuous and notorious.  Multiple and an extreme chemical fires erupted in the South Draw mostly from the combusting of over 1,000 chemical barrels that, upon information and belief, were from IBM and that the Pratts had allowed Mr. Neuhauser to dump.  The smoke and flames from the fire could be seen many miles away, including by the most of the Boulder and Weld County communities and including, upon information and belief, by the Pratts at their Longmont home.

17.     Upon information and belief, the indicia of significant and toxic landfilling could be seen by Harold Pratt, and later by Ken Pratt, as they farmed the lands in the immediate vicinity of the South Draw during the 1960's, 1970's and afterwards.  Such visible landfilling in the South Draw included charred, rusted and partially buried 55-gallon steel, chemical barrels, other computer-related and industrial waste. Upon information and belief, all of the same were easily and frequently viewed by Harold and Ken Pratt during their farming activities at the edges of the South Draw.

18.     In addition to Ken Pratt's foregoing and direct knowledge of such toxic landfilling, Ken Pratt was further directly confronted by governmental agents who specifically informed him that they had discovered landfilling in the South Draw.  In the course of issuing the 1990 Assessment, CDPHE's Investigative Officer, Austin Buckingham, personally met with Ken Pratt.  At that time, Ken Pratt individually owned the Redtail Property with Karen Kramer.  In a 1990 face-to-face meeting, Austin Buckingham specifically informed at least Ken Pratt of the 1990 Assessment's conclusions that substantial solid waste landfilling had occurred in the Property's South Draw.  Austin Buckingham provided detailed statements to Ken Pratt that apprised him of the specific types of landfilling in the South Draw (including details of Mr.

Neuhauser's disposal of solid and toxic waste from IBM and others on the Redtail Property). During such meeting Ken Pratt was further informed that the 55-gallon drums had degraded or were degrading, including drums visible on the surface of the South Draw. Soon after his meeting with Austin Buckingham, Ken Pratt transferred the Redtail Property to WWD.

19.     Upon information and belief and during WWD's ownership of such property (including ownership of the portions now known as the Neuhauser Landfill), the release, disposal, discharge, deposit, spilling, and/or leaking of the aforementioned hazardous substances occurred, including at the site of the Neuhauser Landfill.

20.     Ken Pratt formed and was a member and manager of WWD with at least the foregoing knowledge of the Pratt family's historical practice of allowing landfilling in the South Draw. Ken Pratt directly knew of such degradation of 55-gallon barrels and likely leaking and spilling of the hazardous substances from such 55-gallon barrels. Ken Pratt transferred ownership of the Redtail Property to WWD with the foregoing and specific knowledge. More recently, but prior to Stratus' purchase of the Redtail Property, the current members (and other agents) of WWD received additional confirmation and knowledge of such toxic dumping and leakages, including in the South Draw, and were further aware of the 1990 Assessment and its conclusions.

21.     Upon information and belief and at all relevant times, Ken Pratt, Karen Kramer, and Ken Pratt's widow, Susan Pratt, all had knowledge and were aware that significant solid and hazardous waste was disposed of and buried in the Redtail Property's South Draw. The entity WWD, by having the aforementioned Pratt family as members (including Ken Pratt, Karen Kramer, and Susan Pratt), also had knowledge, at all relevant times, of the significant solid and hazardous waste disposal on the Redtail Property.

22.     Unfortunately for Stratus, Stratus learned of all of the foregoing, toxic landfilling in the South Draw, and that the founding and current members of WWD were fully aware of the same, only after Stratus had purchased the Redtail Property.

23.     As a result of all of the foregoing, WWD is a PRP and is liable under CERCLA for its actions including, without limitation, its actions as an owner, operator and arranger, and for its release and disposal of such hazardous substances at the Neuhauser Landfill.

## IV.    THE SITE AND STRATUS' REMEDIATION EFFORTS AND GENERAL ALLEGATIONS

1.     The Neuhauser Landfill site occupies approximately 18.5 acres within the South Draw of the Redtail Property.  The South Draw is a long, steep ravine and a drainage area containing a spring that runs into several small ponds further down the Draw.  The South Draw and the Neuhauser Landfill are situated in the northeast corner of the Redtail Property.  The Redtail Property is an undeveloped parcel of land consisting of approximately 290 acres, located in Weld County, Colorado and within the northeast portion of Section 29, Township 1 North, Range 68 West (Weld Co. Parcel #146729400002). The Redtail Property has a general descriptive location of approximately 2 miles southeast of Erie, Colorado and portions of such Property are close to the intersection of Colorado County Roads No. 4 and No. 5

2.     In early 2017 and after confirming the presence of hazardous waste in the South Draw, the CDPHE and EPA stated their intentions to initiate legal proceedings against Stratus for the remediation of the Neuhauser Landfill.   Given the likelihood that Stratus would be confronted with substantial litigation cost and/or much higher remediation costs if such governmental agencies conducted such clean up actions, Stratus cooperated with such agencies and took the initiative to expeditiously and responsibly remediate the Neuhauser Landfill.

3.     Among other things and in 2017 and 2018, Stratus entered into the AOC and the COC.

4.     Stratus had already engaged in investigative and other work that was a reasonably necessary precursor to its more extensive remediation efforts under the AOC and COC. Pursuant to the AOC and COC and up to the present date, Stratus has expended significant efforts and costs in remediating the contamination at the Neuhauser Landfill, including incurring significant efforts and costs taking action in accordance with the provisions of the AOC and COC.

5.     With respect to the same and to date, Stratus has actually incurred in excess of $4,000,000.00 in such environmental remediation and cleanup costs. Stratus currently estimates incurring additional and mandated cleanup, capping, groundwater testing and long term monitoring costs approximate an additional $3,500,000.00 (for a total estimated environmental cleanup cost in excess of $7,000,000.00). Stratus' final cleanup, capping and monitoring efforts are estimated to continue at least into 2020 (and monitoring requirements may extend for up to an additional 30 years).

6.     All of Stratus' actual and anticipated "response" costs (as defined in CERCLA Section 101(25)) were incurred pursuant to the Consent Orders, and such costs and including Stratus' related investigative costs, are reasonable and necessary, and are consistent with CERCLA's National Consistency Plan ("NCP"). Among other things, Stratus has prepared extensive studies and work plans (including without limitation Removal Work Plans, Health and Safety Plans, Sampling and Analysis Plans, Community Participation Plans, monthly and daily work-logs, etc.). All of the same were all consistent with the AOC and COC. Among other things and per such plans, Stratus implemented responsible excavation and removal actions of the IBM drums and associated contaminated soils within the Neuhauser Landfill.

7.      During the course of such drum removal activities, Stratus discovered at least 1,100 identifiable carcasses of the barrels admittedly disposed of by IBM via Mr. Neuhauser's company at the South Draw.  Most drums had decayed, leaked or otherwise spilled their contents into the surrounding soils.  Several drums still contained some original, toxic VOC content with identifiable labels (indicating IBM's ownership/usage or with labels of the original chemical suppliers from whom IBM had purchased such toxic VOCs).  Per the AOC, Stratus was required to, and did, remove at least 2,000 cubic yards of contaminated soils (which required further testing and transportation for offsite disposal all in accordance with the requirements of the AOC).

8.      Upon information and belief, such 55-gallon steel drums containing the above-mentioned, toxic liquids, degraded, rusted and substantially leaked and released their hazardous substances at all relevant times during WWD's (and possibly the Pratt family's) ownership of the Pratt property, including the site of the Neuhauser Landfill.  Such degradation and passive leakage of the toxic contents of the 55-gallon steel drums all occurred with WWD's and the Pratt family's reasonable knowledge and awareness given their authorization of the dumping, burying, incineration, etc. of such steel drums at the Neuhauser Landfill.

9.      The EPA and AOC required Stratus' further and final compliance with the CDPHE's COC, including without limitation, requirements that Stratus conduct further and anticipated investigation and closure of the Neuhauser Landfill site, additional response action related to the groundwater at the site and long-term monitoring of such groundwater (with such monitoring potentially extending for many years into the future).

10.      All response costs incurred, and to be incurred, by Stratus (including but not limited to all of Stratus' actions regarding preliminary assessment, site investigation, removal

14

and remediation work, post-removal capping, monitoring and maintenance) are: a) consistent with the AOC and COC; b) met with approvals of the EPA and CDPHE; c) consistent with the NCP; d) in substantial compliance with the applicable requirements for a private party action and resulted in a CERCLA-quality cleanup; and e) reasonable and necessary to address the releases and threatened releases at the Neuhauser Landfill. These same characteristics will accompany all of Stratus' anticipated, future and final action to cap the site and conduct monitoring activities (Stratus is in final stages of obtaining approvals of plans for such response action).

11.     Stratus is entitled to seeks cost recovery and contribution from each Defendant pursuant to Sections 107(a) and 113(f) of CERCLA, 42 U.S.C. § 9607(a) and 9613(f), for all of its past and future response and remediation costs incurred and to be incurred by Stratus related to the cleanup of the Neuhauser Landfill (and additionally to recover, without limitation, the yet to be determined and assessed "oversight" costs of the EPA and CDPHE).

12.     Stratus has demanded payment from IBM and WWD for any and all amounts it has incurred, and will incur, in response costs, and including investigative costs, and post-closure costs.  To date, neither IBM nor WWD has paid, or reimbursed Stratus, the EPA, the CDPHE, or any other third party for any response costs incurred by Stratus at the Neuhauser Landfill.

13.     After Stratus' good faith investigation for potential PRPs with respect to the Neuhauser Landfill, Stratus believes that the only currently existing and legitimate PRPs are Defendants IBM and WWD.

## FIRST CLAIM FOR RELIEF

### (COST RECOVERY UNDER CERCLA)

1.     Plaintiff incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

2.      Section 107(a)(1)-(4) of CERCLA,  42 U.S.C. §§ 9607(a)(1)-(4), provides, in relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section –
>
> (1)  the owner or operator of a vessel or facility;
>
> (2)  any person who at the time of disposal of any hazardous substance owned or operated a facility:
>
> (3)  any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for – (A) all costs of removal or remedial action incurred . . . not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

3.      "Disposal" is defined as CERCLA Section 101(29) by reference to the Solid Waste Disposal Act ("SWDA").  See, 42 U.S.C. § 9601(29).  The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

4.      "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed...."  42 U.S.C. § 9601(9).

5.      "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4.  42 U.S.C. § 9601(14).

16

6.      "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21).

7.      "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

8.      "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto.  42 U.S.C. § 9601(25).

9.      The Neuhauser Landfill is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

10.      There has been a "release" and/or a threatened "release" or "threatened release" of "hazardous substances" by IBM and WWD at the Neuhauser Landfill which has caused the incurrence of "response costs" by Stratus, within the meanings of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. § 9601(22), 9601(14) and 9607.

11.      Stratus is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

12.      Each of the Defendants is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

13.      Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(1), 9607(a)(2) and/or 9607(a)(3), Defendant WWD is liable as an owner or arranger, and Defendant IBM is liable as a generator or

arranger of materials containing hazardous substances, which materials were disposed of and released at the Neuhauser Landfill.

14.     As a result of the release and threatened release of hazardous substances at or from the Neuhauser Landfill, Stratus has incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

15.     The response costs incurred by Stratus in connection with the Neuhauser Landfill are consistent with the NCP and are otherwise reasonable and necessary to take responsive action, and to remediate the groundwater and cap and monitor the Neuhauser Landfill.

16.     Pursuant to CERCLA Sections 107, 113, 42 U.S.C. § 9607 and 9613, each Defendant is strictly, jointly and severally liable for the voluntary past and future response costs incurred and to be incurred by Stratus in response to the release or threatened release of hazardous substances at and from the Neuhauser Landfill.

## SECOND CLAIM FOR RELIEF

### (CONTRIBUTION UNDER CERCLA)

17.     Plaintiff incorporates by referenced all of the foregoing paragraphs as if fully set forth herein.

18.     Sections 113(f)(1) and (f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(1) and (f)(3)(B), provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a)....

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement....

19.     Stratus has resolved its liability to EPA for matters covered in the AOC, except to the extent that the AOC contemplates Stratus' final response actions per the COC.

20.     All Defendants are liable parties under CERCLA, but have not resolved their liability to Stratus.

21.     Through that date of the filing of this Complaint, Stratus has been compelled to incur and/or otherwise pay over $4,000,000.00 in response costs at the Neuhauser Landfill under AOC, and including the AOC's requirements for Stratus to perform and to continue to perform response actions under the COC.  Stratus currently estimates that it will incur additional remediation and post-closure and monitoring and maintenance costs, all as mandated by the COC, that approximate $3,500,000.00 (for a total estimated environmental cleanup cost in excess of $7,000,000.00).  Stratus seeks recovery of the same from IBM and WWD.

22.     Stratus is entitled to contribution from all Defendants under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for Defendants' respective equitable shares of all costs and damages incurred by Stratus, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

## THIRD CLAIM FOR RELIEF

### (DECLARATORY RELIEF UNDER CERCLA)

23.     Plaintiff incorporates by referenced all of the foregoing paragraphs as if fully set forth herein.

24.     There is a present and actual controversy between Stratus and all Defendants concerning their respective rights and obligations with respect to the response costs associated with the Neuhauser Landfill.

25.     Sections 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides, in relevant part, that:

> In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages.  A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action.  Except as otherwise provided in this paragraph an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

26.     Stratus seeks a declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against all Defendants holding them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs.

27.     Stratus is entitled to judgment against all Defendants for past and future response costs incurred in connection with the Stratus Redtail Ranch Site.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in its favor and against Defendants:

A.  Ordering Defendants to pay cost of recovery and/or contribution to Plaintiff in a sum to be determined by the Court to be owed to Plaintiff for response costs, plus interest to the maximum extent permitted by law;

B.  Awarding Plaintiff its costs and attorneys' fees as may be available in law or equity;

C.  Awarding declaratory judgment against all Defendants finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of all past and future response costs, including appropriate pre-judgment interest, associated with the Neuhauser Landfill; and

D.  Awarding Plaintiff all other relief that the Court deems appropriate;

DATED:  September 12, 2019

Respectfully submitted,

By: s/ Erich L. Bethke
     Erich L. Bethke, #17299
     Charles E. Fuller, #43923
     Senn Visciano Canges P.C.
     1700 Lincoln St., Suite 4300
     Denver, Colorado 80203
     303-298-1122
     ebethke@sennlaw.com
     cfuller@sennlaw.com

     *Attorneys for Plaintiff,*
     *Stratus Redtail Ranch, LLC*